Douglas B. DENNIS

v.

Hayden DEES, Acting Warden, Louisiana State Penitentiary.

Misc. No. 948.

United States District Court
E. D. Louisiana,
Baton Rouge Division.

Jan. 25, 1968.

Leon A. Picou, Jr., C. Jerome D'Aquila, St. Francisville, La., for petitioner.

Jack P. F. Gremillion, Atty. Gen., State of Louisiana, Jodie Stout, Asst. Atty. Gen., State of Louisiana, Baton Rouge, La., for respondent.

WEST, District Judge:

Petitioner, Douglas B. Dennis, is presently incarcerated at the Louisiana State Penitentiary awaiting execution of the death sentence imposed upon him on March 11, 1966. He applies to this Court for a writ of habeas corpus alleging that his federally protected rights have been violated in that (1) he was forced to stand trial for murder dressed in striped prison garb, wearing safety chains, restraining belt, handcuffs and leg irons, all of which deprived him of his right to the presumption of innocence in violation of the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution; (2) the Court failed to timely assign him counsel and he was denied the right to obtain counsel of his own choice even though he requested to do so, all in violation of the Sixth Amendment to the United States Constitution; (3) he was denied a continuance of his trial date even though he and his court-appointed attorney had not had sufficient time to prepare his defense, in violation of the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution; (4) he was denied compulsory process for obtaining witnesses in his favor in violation of the Sixth Amendment to the United States Constitution; and (5) the District Attorney, in his closing argument, made improper, inflammatory remarks, thus depriving him of the due process and equal protection of the law as guaranteed him by the Fifth and Fourteenth Amendments to the United States Constitution.

Since the Court has concluded that there is merit to petitioner's first contention, there will be no need to pass upon the other grounds relied upon.

On November 24, 1964, while petitioner was an inmate at Louisiana State Pen-

itentiary, another inmate of that institution, one Robert Lee George, was allegedly murdered. An investigation ensued during which petitioner became a suspect. On May 7, 1965, petitioner was charged by indictment with the murder of Robert Lee George. On May 14, 1965, Leon A. Picou, Jr., Esq., an experienced criminal lawyer, was appointed chief counsel to represent the defendant, and David French, Esq. and William Cooper, Jr., Esq., both of whom had less than the five years experience required by Louisiana law for appointment by the Court as chief counsel in a capital case, were appointed to assist Mr. Picou in petitioner's defense. After these attorneys were appointed, and after consultation with his attorneys, petitioner entered a plea of not guilty and trial was set for June 14, 1965. On June 10, 1965, Mr. French, who had done much of the investigation work in connection with petitioner's defense, joined the staff of the Attorney General of the State of Louisiana and thus withdrew as counsel in this case. Mr. Cooper, who had assisted Mr. French in the investigation work, was called to active duty in the Air Force Reserve and withdrew as counsel on June 11, 1965. Thereafter, on the day of the trial, June 14, 1965, William F. Kline, Esq., was appointed by the Court to assist Mr. Picou in the defense of this case. On the day of the trial, Mr. Picou, on defendant's behalf, entered a motion for continuance but this motion was denied. The trial, which was held on June 14, and 15, 1965, resulted in a guilty verdict. On March 11, 1966, petitioner was sentenced to death as provided for by the laws of the State of Louisiana. An appeal to the Louisiana Supreme Court was taken based upon several bills of exception, one of which, Bill of Exception No. 10, was directed at the Trial Court's overruling of petitioner's objection to standing trial before a jury dressed in striped prison garb, safety chains, restraining belt, handcuffs and leg irons. The Louisiana Supreme Court found no merit to this Bill of Exception. It stated that its rulings with regard to Bills of Exception

Nos. 4, 6, 12 and 16 adequately answered this contention. See State v. Dennis, 250 La. 125, 194 So.2d 720, at 724 (1967).

But the rulings on those exceptions do not, in this Court's opinion, answer the complaints of petitioner that were contained in his Bill of Exception No. 10. The Bills of Exception numbered 4, 6, 12 and 16 all pertained to the refusal of the Court to order the Sheriff to produce in Court, some twelve or more inmate witnesses, before trial, so that they could be interviewed by defense counsel, and to the Court's refusal to issue certain instanter subpoenas. In finding no merit to those bills of exception, the Louisiana Supreme Court quoted, with approval, the Per Curiam of the Trial Judge which stated:

" 'Some 15 prison inmates had been subpoenaed by the defense for the morning of the trial but being considered a "security risk" by the sheriff, the prison authorities decided to withhold sending of the inmate witnesses until needed for the trial. Deputy Sheriff Daniel testified such was his recommendations because of the problem of custodial supervision and because from his experience two or three days are required to draw a jury in a capital case. No authority was given this Court to require the presence of prison inmate witnesses prior to their being needed as witnesses. Especially where the professed purpose was to be made available for interview by attorneys.

" ' * * *

" 'The security facilities of the parish court house are meager. There is no jail at or adjacent except for a barred witness room. The presence of any sizeable number of prison inmates presents an escape hazard and a safety risk to the community. In such instances where such witnesses are made available for testifying they are confined in a trailer, locked up on the court house lawn or immediately adjacent thereto.' "

After thus quoting the Trial Judge, the Court concluded:

"Nothing in this record discloses that defendant was deprived of the testimony of any witness which his counsel desired subpoenaed. There is no showing that the desired witnesses were not eventually produced, nor that their production at the time thought to be safe by Deputy Sheriff Daniel was prejudicial to defendant's case. There is also no showing made that defendant suffered any deprivation of constitutional rights guaranteed him by the State and Federal Constitutions.

"Under the facts and circumstances connected with Bills of Exceptions Nos. 4, 6, 12 and 16, we do not find that defendant suffered any prejudice by the trial judge's rulings."

Then, when the Court considered Bill of Exception No. 10, relating to petitioner having to stand trial before a jury, dressed in striped prison garb, safety chains, restraining belt, handcuffs and leg irons, the Court concluded:

"Our rulings with respect to Bills of Exceptions Nos. 4, 6, 12, and 16, supra, adequately answer the contentions of defense counsel. We also agree with the following statement of the trial judge in his Per Curiam to Bills of Exceptions Nos. 4, 6, and 10:

" 'No prejudice to the accused's rights in appearing in shackles and handcuffs was shown. This was a prison inmate case and the deputy testified the handcuffs and shackles was deemed necessary as policy of their office for security reasons.'

"The record shows that the defendant is a vigorous man of twenty-eight or twenty-nine years of age, about six feet tall, and weighing approximately two hundred and twenty to two hundred and twenty-five pounds."

It is difficult indeed to understand how it could be concluded that the reasons for not requiring the Sheriff to produce in court, at one time, some twelve or fifteen convict witnesses, in advance of trial, when it was shown that the facilities at the court house were not sufficient to prevent their possible escape or to assure the safety of the community and the persons involved in the trial, are sufficient reasons for requiring a single defendant to remain in striped prison garb, safety chains, restraining belt, handcuffs and leg irons during an entire trial held before a jury, particularly when the evidence shows that there were guards composed of prison trusties and penitentiary police, armed with automatic weapons and/or shotguns, stationed at every corner of the building and at all points of ingress and egress to and from the courtroom.

There was no evidence whatsoever to indicate that the petitioner had ever tried to escape or that he had, during his incarceration, been in any way difficult to handle. The fact that he, a single individual, was "a vigorous man of twenty-eight or twenty-nine years of age, about six feet tall, and weighing approximately two hundred and twenty to two hundred and twenty-five pounds" certainly made him no match for the many guards, armed with shotguns and automatic weapons, stationed at the two entrances to the courtroom and at every outside corner of the building, and possibly elsewhere. The evidence simply does not support the alleged need for such extraordinarily obvious precautions in this case, and it most certainly does not support any claimed need to require the petitioner to stand trial clothed in striped prison garb. In the modern courtroom as little show of arms must be made as possible, and ordinarily, the necessary restraint can be accomplished by placing ununiformed guards near the prisoner. Hall v. State, 199 Ind. 592, 159 N.E. 420, 423. The prejudice that would obviously operate against a defendant being tried before a jury for murder, unnecessarily attired in striped prison garb, safety chains, restraining belt, handcuffs and leg irons would, without doubt, outweigh any danger under the circumstances of this case that this one individual could possibly present while in the courtroom under the close scrutiny of the guards

and court personnel that were stationed therein.

 There is, of course, no question but that the use of guards in the courtroom during trial, and that the necessity for the use of manacles on a defendant are ordinarily considered to be within the sound discretion of the Trial Court. People v. Kimball, 5 Cal.2d 608, 55 P.2d 483; State v. McKay, 63 Nev. 118, 165 P.2d 389, rehearing denied 63 Nev. 118, 167 P.2d 476; State v. Boyd, Mo., 256 S.W.2d 765; State v. Boone, 355 Mo. 550, 196 S.W.2d 794, certiorari denied, Boone v. Stewart, 334 U.S. 823, 68 S.Ct. 1078, 92 L.Ed. 1752; Marion v. Commonwealth, 269 Ky. 729, 108 S.W.2d 721; Gray v. State, 99 Tex.Cr.R. 305, 268 S.W. 941, second rehearing denied, 99 Tex.Cr.R. 305, 269 S.W. 1056; Commonwealth v. Agiasottelis, 336 Mass. 12, 142 N.E.2d 386. But a person charged with crime cannot be subjected, before conviction, to any more restraint than necessary for his detention to answer the charge. People v. Mendola, 2 N.Y.2d 270, 159 N.Y.S.2d 473, 140 N.E.2d 353. And an abuse of the discretion thus vested in the Trial Court "might well reach a point where the trial is a farce and a fair trial impossible." McCloskey v. Boslow, 349 F.2d 119 (CA 4—1965). As stated by the Court in Way v. United States, 285 F.2d 253 (CA 10—1960).

"It is the general rule that under ordinary circumstances, freedom from handcuffs, shackles or manacles of a defendant during the trial of a criminal case is an important component of a fair and impartial trial. In other words, such procedure should not be permitted except to prevent the escape of the accused, to prevent him from injuring others, and to maintain a quiet and peaceable trial." See also Smith v. State, 247 Ala. 354, 24 So.2d 546 (1946); Blaine v. United States, 78 U.S.App.D.C. 64, 136 F.2d 284 (1943).

Since the use of manacles and other forms of restraint on a defendant while on trial lies generally within the sound discretion of the Trial Judge, it necessarily follows that where an abuse of that discretion is alleged, the burden of proof is upon the petitioner to sustain his allegation. Odell v. Hudspeth, 189 F.2d 300 (CA 10—1951). The record in this case amply supports petitioner's allegation. The only excuse offered by the Trial Court for the obvious display of weapons, guards and other restraints, including the forced wearing of striped prison garb, is that it is the "policy" of the local Sheriff's Office to use such restraints. This explanation is not sufficient to rebut the allegations and proofs offered by petitioner in this case.

 This Court is not unmindful of the fact that petitioner was, at the time of his trial, an inmate of Louisiana State Penitentiary serving time on a prior murder conviction. But at the time complained of he was not being tried for that prior offense. He was being tried for a new offense and he was entitled to the full presumption of innocence in connection with that alleged offense. The Court is also not unmindful of the need for the Trial Court to take the necessary precautions for the safety of the people in the courtroom and for the public at large, and to prevent the possible escape of the defendant. But when exercising this discretion the Court must, in general, stay within the bounds of fair play and in particular, within the bounds of the constitutional guaranties of due process and equal protection of the laws. While this Court is most reluctant, in a habeas corpus proceeding, to hold that a Trial Judge abused his discretion, particularly when his actions have been passed upon and approved by the appropriate appellate court of the state, nevertheless, when it is determined that constitutional safeguards have not been preserved, such a ruling is compelled.

 It is difficult indeed to imagine why this petitioner was forced, over his objection, to stand trial before a jury dressed in striped prison garb. Angola inmates, including those convicted of capital offenses, are regularly brought before this Court and others on habeas corpus petitions, and never in the memory of this Court has one been forced to

**359**

appear here in a striped prison suit. When this particular petitioner was presented here for his habeas corpus hearing, he was, as most others have been, dressed in khaki pants and shirt, with no indication that he was necessarily wearing a prison uniform. The forced wearing of striped prison garb certainly could have little or nothing to do with security precautions in this case. As declared in Eaddy v. People, 115 Colo. 488, 174 P.2d 717, "the presumption of innocence requires the garb of innocence." To force a defendant, against his will, to stand trial before a jury dressed in striped prison garb is the very antithesis of the "garb of innocence" and hence is, in the opinion of this Court, a deprivation of the due process of law guaranteed by the Fourteenth Amendment to the Constitution of the United States. For this reason, even if for no other, petitioner's application for a writ of habeas corpus should be granted.

But as previously stated, there is also, in this case, a serious question of whether or not the extraordinary show of strength, i. e., the large number of guards armed with automatic weapons and shotguns, in addition to the abundant use of restraining devices, i. e., handcuffs, safety chains, restraining belt, and leg irons, all worn by petitioner during the entire trial before the jury, constituted more restraint than was reasonably necessary under the circumstances of this case. It is this Court's opinion that even if the forced wearing of striped prison garb were not enough to constitute reversible error, surely, when you combine that fact with the so-called "security precautions" that were taken and displayed so obviously in this case, the conclusion is inescapable that the defendant could not, under those circumstances, have been given a fair and impartial trial as required by the Constitution and laws of the United States of America.

Thus, without passing upon the remaining contentions of petitioner, for the reasons herein contained, petitioner's application for a writ of habeas corpus will be granted.

But this, of course, does not necessarily mean that petitioner will be set free. First of all this decision in no way affects any other sentence which he may be serving, and secondly, the State of Louisiana will, of course, be given a reasonable time, say three months from the date of this opinion, within which to re-try petitioner for the offense involved herein. The Court is aware of the fact that ordinarily habeas corpus will not lie when to grant it would not result in the complete release of the petitioner. But an exception to this rule must be made where, as here, habeas corpus is sought to release the petitioner not from incarceration in the penitentiary, but from the execution of a death sentence. In such a case, petitioner has the right to have his petition for habeas corpus heard and determined even though, if granted, he is still subject to continued incarceration for a prior conviction. Judgment will be entered accordingly.